RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PATRICIA LANMAN,

　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

No. 06-2263

ROBERT HINSON, JAMES SIEGFRIED, MIKE MOREY,
LINDA SHAFFER-PRICE, GEORGE WHITE, JULIE
STIVER, R.N., EDWINA KOEHN-KOLDENHOF, R.N.,
JEAN PRANDINE, STEVEN BRONSINK,

　　　　　　　*Defendants-Appellants.*

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00122—Robert H. Cleland, District Judge.

Argued: November 29, 2007

Decided and Filed: June 17, 2008

Before: KENNEDY, MARTIN, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark E. Donnelly, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Heather A. Jefferson, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellee. **ON BRIEF:** Mark E. Donnelly, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Heather A. Jefferson, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellee.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. On January 5, 2002, Eugene Lanman was admitted to Kalamazoo Psychiatric Hospital. The next day, while suffering psychiatric delusions, he attacked a staff member. Lanman was immediately restrained by staff and administered medication to calm him down. During the attempt to restrain Lanman, he stopped breathing and never regained consciousness. He died seventeen days later after being taken off life support. His personal representative brought this action against the staff of the hospital, alleging violation of Lanman's constitutional rights in transgression of 42 U.S.C. § 1983, abuse or neglect in violation of Michigan

1

law, and assault and battery. The district court denied defendants' motion for summary judgment claiming qualified immunity on all of plaintiff's claims, and defendants brought this interlocutory appeal challenging that ruling.

I.

The decedent-plaintiff, Eugene Lanman, was a veteran with a history of mental illness. On January 5, 2002, he was found wandering the countryside by the Kalkaska County Sheriff's Department. He was taken to the Antrim/Kalkaska County Community Mental Health Department for a mental health assessment. Beverly Robinson conducted Lanman's assessment and determined that he needed in-patient psychiatric care on an emergency basis. She arranged for Lanman to be transported to the Kalamazoo Psychiatric Hospital.

Lanman arrived at the psychiatric hospital at 9:30 p.m. that same night suffering from auditory and visual hallucinations, suicidal ideations, and his legs were shaking uncontrollably. Dr. S.B. Kondapaneni examined Lanman and determined he needed to be admitted to the hospital for immediate psychiatric treatment. Dr. Kondapaneni determined that Lanman was a danger to himself and was in need of intensive in-patient psychiatric care. Lanman was then admitted on a voluntary basis when he filled out the Adult Formal Voluntary Admission Application.

Kondapaneni prescribed Celebrex for Lanman's back pain and Vasotec for his blood pressure. Kondapaneni did not prescribe any psychotropic drugs. Kondapaneni attempted to determine whether Lanman was suffering from the side effects of having previously received psychotropic drugs, but was unable to perform the requisite test at that late hour. After his admission to the hospital, Lanman was directed to stay in a "quiet room," a room which allowed hospital staff to closely monitor Lanman. He was not given a room assignment, any psychiatric treatment, or any psychotropic medications.

The next morning, after spending all night in a "quiet room" and still not having received any treatment, Lanman was becoming increasingly agitated. He was pacing in circles in the hallway, talking to himself, and trying to open the doors to other patients' rooms. By 9:10 a.m., eleven hours after admission, Lanman was extremely upset. He was banging his head and hands on the walls and doors, and not complying with staff requests to calm down and return to the "quiet room." Finally, staff requested he be medicated to calm him down. Dr. Van Putten ordered 2 mg of Ativan be administered to Lanman. Defendant Nurse Edwina Koehn-Koldenhof went to the medication room to draw the Ativan.

While Nurse Koldenhof was drawing the medicine, Lanman attacked resident care aide Mike Morey, and attempted to choke him. Another aide, James Siegfried, attempted to grab Lanman from behind, but Siegfried tripped and both Lanman and Siegfried fell to the ground. Siegfried asked Lanman to calm down, but Lanman continued to struggle, flailing his arms and legs. When Siegfried and Lanman fell to the floor, aides Linda Price and Morey immediately tried to restrain Lanman's legs. A "code easy" alarm had been sounded when Lanman attacked Morey, alerting other hospital staff that help was needed. Aides Jean Prandine, George White, Tom Bissiden, Bob Hinson, and Steve Bronsink all responded to the "code easy." White relieved Morey and Price who were attempting to control Lanman's legs, but were being kicked violently by Lanman. Hinson grabbed Lanman's left arm and extended it up and away from Lanman's body.

Nurse Koldenhof arrived with the Ativan and administered it. Nurse Julie Ann Stiver, who had arrived in response to the "code easy," ordered that Lanman be placed in restraints. While Hinson was attempting to place a restraint on Lanman's left wrist, someone stated there was a problem and that Lanman wasn't breathing. Lanman was turned on his back and Hinson immediately started chest compressions. CPR was administered and paramedics were called.

Lanman began breathing again and was taken by ambulance to Bronson Hospital. He never regained consciousness and died after being taken off life support.

Plaintiff relies primarily on the deposition testimony of Richard P. Hunter, a fellow patient at the hospital who witnessed the altercation. Hunter testified that he was sitting on a bench approximately five feet from where Lanman was restrained. He stated that at least six individuals held Lanman face down on the floor, and one of those individuals placed his knee in Lanman's back in attempt to hold him down. Hunter also testified that staff members had Lanman's legs crossed and were bending his legs back toward his head while Lanman was on his stomach. According to Hunter, Lanman was having obvious difficulty breathing and was crying out for help because he could not breathe. Two or three minutes later, Lanman was noticeably more calm, and a few minutes after that looked as if he had passed out. Hunter stated that the staff ignored Lanman until one of the nurses noticed he was passed out. Hunter gave a similar account to the Kalamazoo police department when they interviewed him shortly after they arrived on the scene.

The personal representative of Lanman's estate, Patricia Lanman, filed suit against defendants Hinson, Siegfried, Morey, Price, White, Stiver, Koldenhof, Prandine, and Bronsink, alleging violations of 42 U.S.C. § 1983; statutory abuse or neglect under Michigan law; and assault and battery. Defendants moved for summary judgment asserting qualified immunity with regard to Lanman's § 1983 claim. The district court denied the defendant's motion, and this interlocutory appeal followed.

II.

This court reviews an order denying summary judgment on qualified immunity grounds *de novo*. *See v. City of Elyria*, 402 F.3d 484, 490 (6th Cir. 2007). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When deciding a motion for summary judgment, this court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Hardesty v. Hamburg Twp*, 461 F.3d 646, 650 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Id.* Nevertheless, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

*A. Jurisdiction*

This Court's review of interlocutory appeals challenging a district court's denial of qualified immunity "is confined to the question of whether all of the conduct which the district court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of objective legal reasonableness." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 537 (6th Cir. 2002) (citations and internal quotation marks omitted). "If the defendant does not dispute the facts alleged by the plaintiff for purposes of the appeal, 'our jurisdiction is clear.'" *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)). "If, instead, the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Id.* "Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal." *Id.* (citing *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir.1997)).

In defendants' reply brief, they concede the most favorable view of the facts to the plaintiff, and state that their appeal involves only the following purely legal issues: (1) the appropriate standard under which to analyze plaintiff's claims; (2) whether the law related to positional asphyxiation of a patient who was physically struggling during an emergency situation in a mental health institution was clearly established at the time; and (3) whether defendants' actions were objectively reasonable viewing the facts in the light most favorable to the plaintiff. Accordingly, this Court has jurisdiction to review defendants' interlocutory appeal of the district court's denial of qualified immunity.

### B. Fourth Amendment v. Fourteenth Amendment

The parties dispute what constitutional standard is implicated by the facts of this case. This is not a purely academic question as the standards of liability vary significantly according to which amendment applies. *See Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test [of the Fourth Amendment] . . . ."). Defendants here argue that plaintiff's claim is governed by the Fourteenth Amendment based on the holdings of the Supreme Court in *Youngberg v. Romero*, 457 U.S. 307 (1982), and this Circuit in *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002). Plaintiff suggests, and the district court agreed, that the Fourth Amendment applies.

The district court held that the facts of the case implicated the Fourth Amendment because it read the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), to hold that *all* excessive force claims should be analyzed under the Fourth Amendment reasonableness standard, rather than the Fourteenth Amendment "substantive due process" approach. *Id*. Subsequently, the Supreme Court clarified that *Graham v. Connor* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997).

We have held that "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Gravely v. Madden*, 142 F.3d 345, 348-49 (6th Cir. 1998)). If the plaintiff was a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard sets the standard for an excessive force claim. *Graham*, 490 U.S. at 395 n. 10. But if the plaintiff was a free person, and the use of force occurred in the course of an arrest or other seizure, then the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard. *Id*. at 395. While this is seen most clearly in the law enforcement setting of arrests or investigatory stops, *Graham*, 490 U.S. at 395, the Fourth Amendment also applies in the civil setting to seizures of individuals for psychiatric evaluations or involuntary confinement. *Monday v. Oullette*, 118 F.3d 1099, 1102-04 (6th Cir. 1997). Thus, the Fourth Amendment reasonableness standard generally applies any time a government official seizes a free citizen with the purpose of potentially creating an involuntary custodial relationship with the State. Because the Fourth Amendment's protection against unreasonable seizures "seems primarily directed to the *initial* act of restraining an individual's liberty," *Phelps*, 286 F.3d at 301 (quoting *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993)), we have stated that the standard applying to a pretrial detainee's excessive force claim "lies in the murky area between the Fourth and Eighth Amendments," *Phelps*, 286 F.3d at 300. At the very least, we have held that "the Fourteenth Amendment . . . 'Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Phelps*, 286 F.3d at 300 (quoting *Graham*, 490 U.S. at 395 n.10). The Fourteenth Amendment is the source of a pretrial detainee's excessive force claim because when a

plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials. *Id*.

In *Youngberg,* the Supreme Court held that the Fourteenth Amendment provides involuntarily committed individuals with the right to be free from undue bodily restraint in the course of their treatment by the State. 457 U.S. at 324. Even though by bodily restraining a patient State actors are using physical force to restrain the liberty of a citizen, *Graham*, 490 U.S. at 395 n. 10 ("A 'seizure' triggering the Fourth Amendment's protections occurs . . . when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'"), the constitutional right recognized by *Youngberg* is not governed by the specific provisions of the Fourth Amendment. This is because the act of physically restraining the patient is for the purpose of medical treatment, which the State has determined is a necessary condition of the patient's confinement.

Likewise, a voluntarily confined individual who is bodily restrained by State actors, related to his consented-to medical treatment, has not been seized for purposes of the Fourth Amendment's application so long as a reasonable person in the patient's position would believe that he was free to leave the State's care. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). If, however, a reasonable person in the patient's position would believe that the physical restraint was not medical treatment, but rather an attempt by the State to transform the voluntary care relationship into involuntary confinement, then the patient has been seized within the meaning of the Fourth Amendment and its standard applies.

Because at the time of the incident, Lanman was not in a situation where his rights were governed by the particular provisions of the Fourth Amendment, we find that the more generally applicable Fourteenth Amendment Due Process Clause applies to his excessive force claim. The Fourth Amendment is inapplicable here because defendants did not "seize" Lanman when they bodily restrained him. By requesting voluntary admission to Kalamazoo Psychiatric Hospital, Lanman consented to defendants providing him medical treatment. Defendants physically restrained Lanman to prevent him from harming himself or others and to administer medication to calm him down. A reasonable person in Lanman's position, as a voluntarily admitted patient in a psychiatric hospital, would believe that the restraint was part of the medical treatment he had authorized, and not an attempt by defendants to keep him there against his will. While the facts viewed in the light most favorable to plaintiff suggest that Lanman did ask defendants to get off of him so he could breathe, there is no evidence to suggest that Lanman expressed a desire to leave the hospital and defendants refused to allow him to do so. Therefore, Lanman was not seized within the meaning of the Fourth Amendment.

We find that the appropriate source for Lanman's excessive force claim is the Fourteenth Amendment, which provides him, as a patient of a state care institution, with the constitutional right recognized in *Youngberg* to freedom from undue bodily restraint in the course of his treatment. Basing this right in substantive due process, rather than the Fourth Amendment, allows for balancing the individual's liberty interest against the State's asserted reasons for restraining the individual's liberty while in its care. It also gives proper deference to the decisions of institutional professionals concerning medical treatment.

The district court relied on *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189 (1989), for the proposition that it was the involuntary nature of the individual's confinement that

invoked the Fourteenth Amendment's protections in *Youngberg* and *Terrance*.[1]  Therefore, it held, because Lanman voluntarily committed himself to Kalamazoo Regional Psychiatric Hospital ("KPH") by signing an admission application, and was theoretically free to leave at any time, he was not owed *any* duties under the Fourteenth Amendment.  We disagree.

    *DeShaney* does not address a situation  in which the State itself, by the affirmative acts of its agents, infringes on an individual's constitutionally protected liberty interests.  The Court in *DeShaney* recognized that the protections of the Due Process Clause may be triggered when the State affirmatively acts and subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement.  489 U.S. at 200 n. 8. Likewise, the Due Process Clause would protect a voluntarily confined individual from deprivations of liberty by state actors that exceed those authorized by his consent to treatment.  The mechanism which brought the individuals to the various facilities, whether considered "voluntary" or "involuntary," is not controlling; in either case they are entitled to freedom from undue restraint at the hands of the State under the Fourteenth Amendment.

    Differentiating Fourteenth Amendment cases from those governed by the Fourth Amendment based on the voluntary or involuntary nature of the state's custody would lead to arguably inconsistent results.  In the present case even though Lanman was technically voluntarily committed, under Michigan law, once he gave the hospital notice of his intent to leave, the hospital could retain him against his will for up to three days.  MICH. COMP. LAWS § 330.1419(1).  Thus, applying the district court's reasoning, if Lanman had decided to leave the hospital, and been retained involuntarily under § 330.1419(1), any § 1983 claims arising in those three days of involuntary confinement would fall under the Fourteenth Amendment.  But immediately prior to his decision to leave, while his confinement was technically voluntary, the Fourth Amendment would apply to any § 1983 claims.  Under such a system, while Lanman's relationship and dependence on the state would not have changed, his constitutional protection would have.  We do not believe such a distinction is warranted.

---

    [1]The district court found the involuntariness argument determinative by reading *DeShaney* to mean that the Constitution only imposes a duty on the State to assume responsibility  for the safety of an individual when it has "take[n] a person into its custody and *holds him there against his will*."  *DeShaney*, 489 U.S. at 199-200 (emphasis added).  But *DeShaney* decided only that the State is not responsible for the actions of third-party private actors against individuals unless it had imposed restraints on the individuals' liberty to render them unable to care for themselves.  *Id.* at 200.  The harms that occurred to the petitioner in *DeShaney* "occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 201.  Furthermore, the *DeShaney* Court noted that the State had played no part in creating the dangers faced by the petitioner nor did it do anything to render him any more vulnerable to them.  *Id.*  This is unlike the present case in which Plaintiff alleges that the State, through the affirmative acts of Defendants, infringed on Lanman's substantive due process right in freedom from undue restraint while in the State's custody.  His status as voluntary or involuntary is irrelevant as to his constitutional right to be free from the State depriving him of liberty without due process.
    At this time, we do not need to decide whether the State owes the same affirmative constitutional duties of care and protection to its voluntarily admitted residents as it owes to its involuntarily committed residents under *Youngberg*. In an unpublished disposition, however, a panel of this Court held that because the plaintiff had been voluntarily admitted to the state mental hospital, the State's constitutional duty to protect those it renders helpless by confinement was not triggered.  *Higgs v. Latham*, No. 91-5273, 1991 WL 21646, at *4 (6th Cir. Oct. 24, 1991) (unpublished).  Our sister circuits are split on this issue.  *See Torisky v. Schweiker*, 446 F.3d 438, 446-47 (3d Cir. 2006) (holding that while a voluntary custodial relationship with the State is not a deprivation of liberty sufficient to trigger the protections of *Youngberg*, a court commitment to state custody is not a necessary prerequisite--a voluntary commitment may become involuntary in nature by state action); *Walton v. Alexander,* 44 F.3d 1297, 1303-04 (5th Cir. 1995) (recognizing that after *DeShaney*, "if the person claiming the right of state protection is voluntarily within the care of custody of a state agency, he has no substantive due process right to the state's protection"); *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 992 (1st Cir. 1992) (finding no substantive due process right to safety under *DeShaney* because voluntary patient was free to leave the facility); *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1245-46 (2d Cir. 1984) (finding *Youngberg's* protections apply to voluntary and involuntary residents alike).

Accordingly, we find that the Fourteenth Amendment governs plaintiff's claim.

### C.  Qualified Immunity

Having found that Lanman was protected by the Due Process Clause of the Fourteenth Amendment while voluntarily committed, we must now determine if his rights were violated. Typically, this Court only has jurisdiction to review final decisions of district courts, and the "denial of summary judgment is ordinarily not a final judgment." *Armstrong v. City of Melvindale*, 432 F.3d 695, 698 (6th Cir. 2006) (citations omitted).  A district court's denial of a claim of qualified immunity on summary judgment, however, is an appealable final decision, so long as the facts are not disputed. *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  Here, as discussed above, defendants concede to the facts viewed in a light most favorable to plaintiff, and claim only that those facts do not demonstrate a violation of clearly established law as required to overcome the affirmative defense of qualified immunity.  Accordingly, this Court reviews the district court's denial of qualified immunity *de novo* under the usual summary judgment standard. *Id.* at 698-99.

Qualified immunity shields public officials who perform discretionary functions from tort liability, so long as their conduct does not violate clearly established rights viewed under the applicable constitutional standard, here, the Due Process Clause of the Fourteenth Amendment. *Id.*; *see also Harlow*, 457 U.S. at 818.  Qualified immunity is an affirmative defense that, once asserted, shifts the burden of proof to the plaintiff to show that the defendant is not entitled to qualified immunity. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).  The application of qualified immunity is determined on a "fact-specific, case-by-case basis." *Armstrong*, 432 F.3d at 699.

In order to determine whether a defendant is entitled to qualified immunity, this Court uses a two-part test: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### A.  Violation of a Constitutional Right

In order to determine whether a constitutional right has been violated, we must first decide whether there exists a constitutional right under the Fourteenth Amendment to be free from unnecessary restraint in a mental hospital.  Specifically, plaintiff claims that the decedent's rights were violated when he was held face down even after he had stopped struggling and told them he could not breathe, resulting in positional asphyxiation.

In *Youngberg*, the Supreme Court held that mental patients retain liberty interests in freedom of movement and in personal security under the Fourteenth Amendment.  457 U.S. at 848-49. However, those interests are not absolute. *Id.*  In order to determine "whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society." *Terrance*, 286 F.3d at 849 (quoting *Youngberg*, 457 U.S. at 325).  In the mental hospital context, that balance "only requires that courts make certain that professional judgment in fact was exercised," in order to adequately protect a patient's rights. *Youngberg*, 457 U.S. at 321. "In making such determinations, decisions made by the appropriate professional are entitled to a presumption of correctness unless it is established that the person responsible did not base the decision on accepted professional judgment." *Terrance*, 286 F.3d at 849.  While the actions of professional decisionmakers, defined as "person[s] competent, whether by education training or experience, to make the particular decision at issue," *Youngberg*, 457 U.S. at 323 n.30, are held to this professional judgment standard, the defendant resident care aides are non-professional employees and are held only to a deliberate indifference standard.  *See Shaw v. Stackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990) (holding that defendant residential service

aides were clearly nonprofessional employees subject only to a deliberate indifference standard). To establish deliberate indifference, Plaintiff must show that defendant resident care aides knew of and disregarded an excessive risk to Lanman's health or safety. *Terrance*, 286 F.3d at 843. Whether Defendants "had the requisite knowledge of a substantial risk [of serious harm] is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that [Defendants] knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right. *Terrance*, 286 F.3d at 842. Here, the district court failed to separately analyze the constitutionality of the individual actions of each defendant. While we find that there are issues of fact as to whether some defendants were deliberately indifferent to Lanman's medical needs, we also find that summary judgment should be granted in favor of other defendants because plaintiff has failed to allege sufficient facts demonstrating that their actions violated Lanman's constitutional rights. We will examine the alleged actions of each defendant in turn, taking into account Richard Hunter's testimony that Lanman was restrained in a dangerous manner after there was no longer need for restraint.

### 1. James Siegfried

Plaintiff's allegations create a material issue of fact as to whether defendant, and resident care aide, James Siegfried was deliberately indifferent to Lanman's serious medical needs. The altercation at issue began when Lanman lunged at defendant Mike Morey, a fellow resident care aide, in an apparent attempt to choke him. In response, Siegfried attmpted to restrain Lanman from behind. The two fell to the floor with Lanman on top of Siegfried. Siegfried rolled Lanman onto his side. Lanman resisted restraint by violently thrashing and kicking at Siegfried and Morey. The code easy alarm was sounded and other staff members arrived on the scene to assist. Siegfried tried to gain control of Lanman's arms by grabbing his wrists. Siegfried was relieved by another staff member moments later. He remained on his knees behind Lanman, however, throughout the altercation. Siegfried denies placing his hands on Lanman's back to hold him down at any time. Siegfried's kneeling position at the top half of Lanman's body, coupled with Richard Hunter's testimony that a staff member used his knees on Lanman's back to hold him down creates an issue of fact as to whether Siegfried restrained Lanamn in a manner that was deliberately indifferent to his medical needs.

### 2. Mike Morey

Plantiff has also alleged sufficient facts to support a finding that defendant Mike Morey was deliberately indifferent to Lanman's serious medical needs. Morey attempted to restrain Lanman's legs during the struggle. Despite Morey's testimony that it was not proper restraint technique to cross a patient's ankles and lift his feet towards the back of the patient's head, defendant Robert Hinson testified that he saw Morey employ such a technique. The affidavit of Gerald Shiener, M.D., states that this restraint position is unsafe for the patient because it interferes with his ability to breathe. Therefore, these facts create a material issue as to whether Morey was deliberately indifferent to Lanman's medical needs.

### 3. George White

There is also a material issue of fact as to whether defendant George White's actions violated Lanman's constitutional rights. White responded to the code easy alarm and came to the aid of the other staff members trying to control Lanman's legs. White testified that Lanman was being restrained face down. In an attempt to restrain Lanman's legs, White laid himself across Lanman's

buttocks and legs. White testified that he continued to hold Lanman down despite hearing him say that he could not breathe. These facts, coupled with the testimony of Richard Hunter, that the staff members continued to restrain Lanman face down on the floor despite the fact that he was having obvious difficulty breathing, he was noticeably more calm after two to three minutes, and he wasn't breathing at all after about five minutes, reveal a genuine issue of fact as to whether White was deliberately indifferent to Lanman's medical needs.

### 4. Robert Hinson

Furthermore, plaintiff has alleged facts that create an issue as to whether defendant Robert Hinson's actions violated Lanman's constitutional rights. Hinson arrived on the scene shortly after the code easy alarm sounded. He grabbed Lanman's left arm and wrist and extended it above his head. Hinson was attempting to place a leather restraint on Lanman's left wrist when he was alerted to the fact that Lanman had stopped breathing. The fact that Hinson had physical contact with Lanman at the time he ceased breathing and he was positioned near the top of Lanman's body, where Richard Hunter testified that he saw someone place their knee on Lanman's back and use his body weight to hold Lanman face down, is enough to create an issue as to whether Hinson was deliberately indifferent to Lanman's medical needs.

### 5. Julie Stiver, R.N.

Moreover, even though defendant Julie Stiver, R.N., did not physically participate in the restraint of Lanman, she may still be liable for a violation of Lanman's constitutional rights under a supervisory liability theory. As the supervisor of the restraint procedure, she can be held liable for the actions of the resident care aides if she "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate[s]." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984) (citing *Hays v. Jefferson County*, 668 F.2d 869, 872-74 (6th Cir.1982)). Defendant Julie Stiver, R.N., may also be liable for her own actions. As a professional decisionmaker, competent because of her education, supervisory position, and NAPPI training to decide to physically restrain Lanman and to use proper methods of restraint, she could only order the physical restraint of Lanman to the extent professional judgment deemed this necessary to assure the safety of himself or others. *See Youngberg*, 457 U.S. at 324. Her decision to restrain Lanman in the manner defendants did is presumptively valid. *Id.* at 323. She will be liable for a constitutional violation of his substantive due process right to be free from undue bodily restraint only if her decision was such a substantial departure from accepted professional judgment that it demonstrates that the manner in which defendants restrained Lanman was not based on such judgment. *Id.*

In the present case, viewing the evidence in the light most favorable to the plaintiff, there is a genuine issue as to whether defendant Julie Stiver, R.N., is liable for the deliberately indifferent conduct of her subordinates and whether she is liable for her own actions as a professional decisionmaker. Stiver ordered the staff to place ankle and wrist restraints on Lanman and supervised the actions of the staff in attempting to do so. Because plaintiff has shown that Stiver was physically present and directly supervising the staff as they restrained Lanman, plaintiff has demonstrated that Stiver at least knowingly acquiesced in the alleged unconstitutional conduct of her subordinates. Also, because the evidence viewed in the light most favorable to the plaintiff demonstrates that at least some of the defendant resident care aides were deliberately indifferent, there is a genuine issue as to whether Stiver's actions show that she failed to exercise professional judgment in ordering and supervising Lanman's restraint.

### 6. Edwina Koehn-Koldenhof

In contrast to the above defendants, plaintiff has failed to allege sufficient facts to support

a finding that the actions of defendant Edwina Koehn-Koldenhof, R.N., violated Lanman's constitutional rights. Koehn-Koldenhof's only physical contact with Lanman consisted of administering an injection of Ativan to calm him down. Plaintiff has not alleged that the injection violated Lanman's constitutional rights nor has plaintiff alleged that Koehn-Koldenhof supervised the staff during the restraint procedure. Without more, Koehn-Koldenhof's presence at the scene and administration of Ativan are insufficient to support a finding that she violated Lanman's constitutional rights. Therefore, summary judgment should be granted in her favor.

### 7. Jean Prandine

Similarly, plaintiff has failed to allege sufficient facts to establish that defendant Jean Prandine's actions violated Lanman's constitutional rights. According to her deposition testimony, Prandine was one of the first to respond to the code easy alarm. She attempted to gain control of one of Lanman's kicking legs, but was almost immediately relieved by another staff member. Prandine's limited involvement in Lanman's restraint does not subject her to individual liability for any alleged constitutional violation that occurred. She should also be dismissed from the case.

### 8. Linda Shaffer-Price

Like Prandine, defendant Linda Shaffer-Price's attempts to control Lanman's legs for a few moments before being relieved by defendant George White do not subject her to individual liability. Because of her limited involvement, no material issue of fact exists as to whether Shaffer-Price was deliberately indifferent to the decedent's serious medical needs. Summary judgment should be granted in her favor as well.

### 9. Steve Bronsink

Plaintiff has failed to allege sufficient facts to prove that defendant Steve Bronsink violated Lanman's constitutional rights. While it is alleged that Bronsink was present and perhaps involved in Lanman's restraint, plaintiff has failed to allege, with any particularity, the unconstitutionality of Bronsink's individual actions. Thus, summary judgment should be granted in his favor.

In sum, drawing all inferences in favor of plaintiff, a reasonable factfinder could conclude that defendants James Siegfried, Mike Morey, George White, Robert Hinson, and Julie Stiver, R.N., restrained Lanman in a dangerous face-down position, with pressure on his back and possibly his neck, with his ankles crossed and extended towards his head. They also could conclude that these defendants ignored Lanman's pleas for them to get off so he could breathe and failed to notice that he was having "obvious difficulty breathing." Indeed, under plaintiff's version of the facts given by eyewitness patient Richard Hunter, Lanman was "noticeably more calm" after two to three minutes of struggling, and five minutes later, "he wasn't resisting at all. He looked like he was passed out." According to Hunter's account of the events, it was not until that point, when Lanman had become unconscious, that one of the hospital staff members noticed he wasn't breathing and the hospital staff slowly got off of him, rolled him on his back, and began CPR. Again, viewing the facts in the light most favorable to plaintiff, a jury could conclude based on the affidavit of Dr. Werner U. Spitz that Lanman "died as a result of the consequences of positional asphyxia committed by the defendant Hospital staff members," and not as a result of Lanman's underlying cardiovascular disease, doxepin toxicity and extreme physical exertion as defendants assert.

Defendants had been trained under NAPPI (Nonabusive Physical and Psychological Intervention) to never restrain a patient face down on the floor or put pressure on the patient's back because of the danger of suffocation. They also had been taught that they should cross a patient's ankles and pull the feet up towards the back of the head only as a technique to exit a seclusion room. The facts taken in the light most favorable to plaintiff reveal that defendants used unapproved and dangerous restraint techniques to control Lanman. The facts also show that defendants continued

to use these dangerous techniques after two to three minutes of struggling when Lanman was "noticeably more calm," and five minutes later, when "he wasn't resisting at all . . . [h]e looked like he was passed out."

Under these facts, a reasonable factfinder could find that defendants James Siegfried, Mike Morey, George White, and Robert Hinson knew that their actions created a substantial risk of serious harm to Lanman, yet they disregarded this knowledge by continuing to restrain him in a dangerous manner for five minutes after he had ceased resisting. A reasonable factfinder could also conclude that defendant Julie Stiver, R.N., as the nurse in charge of the restraint procedure, is liable for her subordinates' unconstitutional actions and/or that she substantially departed from professional judgment in her supervision of the resident care aides' deliberately indifferent actions. Therefore, we find, viewing the facts in the light most favorable to plaintiff, that a reasonable factfinder could conclude that defendants James Siegfried, Mike Morey, George White, Robert Hinson, and Julie Stiver, R.N., violated Lanman's Fourteenth Amendment substantive due process right to freedom from undue bodily restraint. However, we also find that summary judgment should be granted in favor of defendants Edwina Koehn-Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink because plaintiff has failed to allege sufficient facts demonstrating that their actions violated Lanman's constitutional rights.

### B. Constitutional Right Was Clearly Established

However, even if defendants violated Lanman's constitutional right, if at the time of the alleged violations it would not have been clear to defendants that their actions were unlawful in the situation they confronted, they are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Officials do not enjoy qualified immunity simply because the exact conduct in question has not previously been held unlawful by a court, but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Overall, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*.

Here, at the time of the alleged constitutional violation, it would have been clear to defendants that their actions would violate Lanman's Fourteenth Amendment substantive due process right to be free from undue bodily restraint. It is not determinative that defendants' exact conduct has not previously been held unlawful by a court. In *Youngberg*, the Supreme Court recognized that involuntarily confined patients in state institutions enjoy the right to freedom from undue bodily restraint; bodily restraint is undue when and to the extent professional judgment deems this unnecessary to assure safety or to provide treatment. 457 U.S. at 324. As we discussed *supra*, the voluntary/involuntary distinction, while perhaps relevant to whether the state has the duty to protect patients from third-party harm,[2] is irrelevant to the right of individuals, whatever their status, to be free from physical abuse at the hands of the State. Thus, it would have been clear to defendants that Lanman enjoyed the Fourteenth Amendment right to freedom from undue bodily restraint recognized in *Youngberg* and reenforced by our Court in *Terrance*.

The facts viewed in the light most favorable to plaintiff demonstrate that defendants knew because of their NAPPI training that restraining a patient face-down on the floor and putting pressure on a patient's back posed a substantial risk of asphyxiation. Despite knowledge of this risk, defendants chose to restrain Lanman using these dangerous restraint techniques. Their actions were

---

[2]We note, though, that the Second Circuit has found that *Youngberg*'s affirmative duties of care and protection from third-party harm extend to voluntary and involuntary residents alike. *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1245-46 (2d Cir. 1984).

objectively unreasonable given the fact that plaintiff's eyewitness testified that defendants continued to restrain Lanman in this dangerous position five minutes after he wasn't resisting at all and looked like he was passed out. It would have been clear to defendants that it was not necessary to continue restraining a patient who looked like he was passed out with techniques that pose a substantial risk of asphyxiation. A reasonable official in defendants' positions would understand that his actions violated Lanman's constitutional right to freedom from undue bodily restraint.

Therefore, we find that the right was clearly established at the time of Lanman's restraint, and defendants James Siegfried, Mike Morey, George White, Robert Hinson, and Julie Stiver, R.N., are not entitled to qualified immunity.

III.

A. *Statutory Abuse and/or Neglect*

The district court denied defendants' motion for summary judgment on plaintiff's claim for statutory abuse and/or neglect under Michigan Compiled Law § 330.1722. That statute provides that "[a] recipient of mental health services shall not be subjected to abuse or neglect." MICH. COMP. LAW § 330.1722(1). The statute further provides that "[a] recipient of mental health services who is abused or neglected has a right to pursue injunctive and other appropriate civil relief." *Id.* at § 330.1722(3). The district court held that the statute's plain language created a private cause of action, and that there is sufficient evidence that Lanman was subjected to abuse and neglect to defeat summary judgment.

Defendants argue that there is no evidence of abuse or neglect as those two terms are defined by Michigan law. They also argue that qualified immunity protects them from liability under Michigan law.

With regard to defendants' first argument, plaintiffs have presented enough evidence to create a genuine issue of material fact as to whether abuse or neglect occurred. Michigan law defines abuse as "nonaccidental physical or emotional harm . . . ." MICH. COMP. LAW § 330.1100a(2). It defines "neglect" as "an act or failure to act . . . that denies a recipient the standard of care or treatment to which he or she is entitled under this act." *Id.* at § 330.1100b(18). Plaintiff has shown sufficient evidence that defendants restrained Lanman face down on the ground by possibly placing their bodies or knees on his back following Lanman's attack on Morey. Plaintiff has also brought forth evidence that defendants ignored Lanman's claims that he was having trouble breathing, and continued to restrain him, even as he began to pass out. These facts, viewed in the light most favorable to plaintiff, are enough to establish a cause of action for abuse or neglect under Michigan law.

In order to defeat defendants' claims for qualified immunity under Michigan law, plaintiff must offer sufficient evidence of gross negligence. *See* MICH. COMP. LAW § 691.1407(2)(c). Gross negligence is defined as conduct "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at § 691.1407(7)(a). Plaintiff has provided the following facts to show defendants were grossly negligent under Michigan law: (1) defendants improperly restrained Lanman face-down; (2) defendants applied significant pressure to his backside, with knowledge that such pressure would make it difficult for Lanman to breathe; (3) defendants also disregarded his pleas for help and his statements that he was having trouble breathing; and (4) defendants did not notice that Lanman was passing out and continued to restrain him once he had gone limp. Relying on our factual analysis under federal law with respect to each individual defendant, we hold that the facts alleged are sufficient to establish a genuine issue of material fact and defeat defendants' motion for summary judgment and claims for qualified immunity under Michigan law with regard to defendants James Siegfried, Mike Morey, George White, Robert Hinson and Julie Stiver, R.N. However, plaintiff has failed to allege sufficient facts showing defendants Edwina Koehn-

Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink were grossly negligent in attempting to restrain Lanman.

### *B. Assault and Battery*

Plaintiff also brought a claim for assault and battery under Michigan law. The district court denied defendants' motion for summary judgment. On appeal, defendants argue that they were legally justified in attempting to restrain Lanman because they were acting to protect themselves as well as others from violence.

As the district court noted, in Michigan, an officer may use such force as is reasonably necessary to effect a lawful arrest or seizure. *Young v. Barker*, 405 N.W.2d 395, 402 (Mich. Ct. App. 1987). If an officer uses reasonable force in making a lawful seizure, then his actions are justified, and he is protected by immunity under Michigan law. *Id.*; *see also Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). "However, an officer who uses more force than is reasonably necessary to effect a lawful arrest, commits a battery upon the person arrested." *White v. City of Vassar*, 403 N.W.2d 124, 130 (Mich. Ct. App. 1987). Applying these standards to Lanman's case, we come to the same conclusion reached above, that the district court did not err when it denied summary judgment to defendants James Siegfried, Mike Morey, George White, Robert Hinson and Julie Stiver, R.N. But we also find that plaintiff has failed to allege sufficient facts to create a material issue of fact to maintain an assault and battery claim against defendants Edwina Koehn-Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink.

### IV.

We find that the Fourteenth Amendment governs the constitutional right of voluntarily committed mental health patients to be free from undue bodily restraint. We also find that the plaintiff in this case has established a genuine issue of material fact under both his federal claim and his state law claims with regard to defendants James Siegfried, Mike Morey, George White, Robert Hinson and Julie Stiver, R.N. However, plaintiff has failed to allege sufficient facts to maintain his claims against defendants Edwina Koehn-Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink. Thus, we AFFIRM the district court's denial of defendants' motion for summary judgment claiming qualified immunity to plaintiff's § 1983 claim with regard to defendants James Siegfried, Mike Morey, George White, Robert Hinson and Julie Stiver, R.N., and REVERSE with regard to defendants Edwina Koehn-Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink. We AFFIRM the district court's denial of defendants' motion for summary judgment on plaintiff's two state law claims with regard to defendants James Siegfried, Mike Morey, George White, Robert Hinson and Julie Stiver, R.N., and REVERSE with regard to defendants Edwina Koehn-Koldenhof, R.N., Jean Prandine, Linda Shaffer-Price, and Steve Bronsink.