RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JOSHUA CLAY,

*Plaintiff-Appellee,*

No. 14-2351

*v.*

MICHAEL EMMI, Hazel Park Police Officer,

*Defendant-Appellant,*

RICHARD STORY, Hazel Park Firefighter/Medic; MICHAEL SHARROW, Hazel Park Firefighter/Medic; PAUL VANDENADELLE, Security Personnel at St. John Oakland Hospital; KEVIN MITCHELL, Security Personnel at St. John Oakland Hospital; ST. JOHN PROVIDENCE HEALTH SYSTEM,

*Defendants.*

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-11555—Victoria A. Roberts, District Judge.

Decided and Filed: August 13, 2015

Before: COLE, Chief Judge; GIBBONS and STRANCH, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:** Marcelyn A. Stepanski, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellant. Trevor J. Zaborsky, ROMANO LAW, P.L.L.C., Pleasant Ridge, Michigan, for Appellee.

1

_____

**OPINION**

_____

STRANCH, Circuit Judge.  This appeal addresses Joshua Clay's § 1983 claim that Police Officer Michael Emmi used excessive force while restraining him during a mental health commitment.  Officer Emmi moved for summary judgment, arguing that the Fourteenth Amendment rather than the Fourth Amendment applies to the use of force claim here, and that he is entitled to qualified immunity because the force he used was appropriate under the circumstances and not prohibited by clearly established law.  The district court determined that the Fourth Amendment applies because the force was used in the context of a seizure, and held that Officer Emmi was not entitled to qualified immunity because there exists a genuine dispute of material fact about the amount of force used.  Officer Emmi appealed and we AFFIRM.

## I.  BACKGROUND

On April 8, 2010, Clay, who has been diagnosed with schizophrenia and bipolar disorder, spoke on the phone with his Easter Seals caseworker about his depression.  The caseworker then called Hazel Park Police dispatch to report that Clay had told her he had a present plan to commit suicide by slitting his wrists.  She asked that the police investigate the situation and explained that Clay had attempted suicide in the past, had been repeatedly hospitalized for expressing suicidal ideations, and might have left his home on foot after she told him she was obligated to report his statements.  Police dispatch assigned Officer Emmi to the job and summoned fire department paramedics to the scene as well.

Officer Emmi and another officer arrived first and spoke with Clay's mother, who was unaware that Clay had called Easter Seals.  Clay was found hiding in a minivan in the driveway.  He explained that he was there because he did not want to go to the hospital.  After the other officer and the paramedics spoke with Clay about going to the hospital, he agreed to go to "just go talk to somebody."  Clay got into the ambulance of his own accord and was driven to the hospital, with Officer Emmi following behind in his vehicle.  Clay was not handcuffed at any point during the journey.

Upon arrival, Clay walked with the paramedics to the emergency department and was placed in a curtained-off area without incident. Someone from the hospital put a gown next to where Clay was sitting and a doctor told him to take off his clothes and put it on. Clay did not want to take his clothes off but he cannot remember if he told anyone that at the time. He does recall that after he made no move to put on the gown, either a doctor or a police officer said, "[Y]ou going to do it the easy way or the hard way?" R. 26-2, Clay Dep., PageID# 356. He believes that at this time two officers, hospital security, a doctor, and possibly some other people were in the room with him. After Clay didn't put the gown on, people in the room "wrestled" him to the ground. *Id*. at 357. According to Clay, "[i]t was just like I'm being jumped. I got took to the ground with a lot of force." *Id.* He cannot remember whether he got up to leave before force was used against him, but testified that because of the number of people in the room he would not have been able to get up and walk out even if he had tried to do so.

Once Clay was brought to the floor, people held his arms, their knees pressed down on his back, and there was a foot in his face, so he could not move. He testified that he did not resist and that he knew he "couldn't resist" because there were "too many people." He thought it wasn't "worth it" to fight because "I can get in trouble for one. And I'm not about to fight with the law." *Id*. at 358. At his deposition, he was asked to clarify his statement that he was "wrestled" to the ground, and he explained that "I went [down] willingly but at the same time they was pulling me like they was wrestling me." *Id*. at 370. He testified that he was not thrashing around or trying to prevent himself from being brought to the ground.

Clay testified that after he was handcuffed he heard someone say, "I'm going to taser you." *Id*. at 358. He laughed because he was already down and secured in handcuffs at that point, but Officer Emmi then used his Taser on Clay's back and everyone else backed off. Clay started yelling and crying when he felt the pain of the electricity running through him. After Officer Emmi stopped, Clay was picked up and put on a hospital bed, still in handcuffs. Later, someone removed the handcuffs and restrained Clay to the bed. He spent the night in the hospital's psychiatric ward, and was released after a day or two. During his stay, he tested positive for cocaine and marijuana.

At his deposition, Clay testified that he had experienced memory problems in the last few years. But despite not being able to remember various details about the events of the day at issue and other life events, he recalled being handcuffed and on the ground before being tasered and testified to that at three separate points during his deposition.

Officer Emmi's account of the facts differs from Clay's in two fundamental respects. First, it includes witness testimony indicating that Clay tried to get up and leave after being told to put the gown on, and that he was "flailing" and trying to get away from hospital staff (though not punching or kicking at them). Appellant's Br. 10-17. Officer Emmi argues that though Clay denied resisting during the incident, his use of the term "wrestled," belies compliance and suggests he struggled against a counter-force or opposition. Officer Emmi's account fails to acknowledge that when directly asked about the word "wrestle," Clay said he "went [down] willingly" but "they was pulling me like they was wrestling me."

Second, Officer Emmi introduces testimony from several witnesses that Clay was placed in restraints only after Emmi warned him that a Taser would be applied and then actually applied it. He refuses to concede Clay's assertion that he was first handcuffed and then tasered.

## II. ANALYSIS

### A. Jurisdiction and standard of review

This court has jurisdiction to hear an appeal from a "final decision" of the lower court. 28 U.S.C. § 1291. A district court's denial of qualified immunity is an appealable final decision under § 1291, "but only to the extent that it turns on an issue of law." *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 495 (6th Cir. 2012) (internal quotation marks removed). A defendant may not appeal a denial of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). There is a limited exception to this rule—where the district court's determination that a dispute of fact exists is "blatantly and demonstrably false." *Romo v. Largen*, 723 F.3d 670, 674 n.3 (6th Cir. 2013). An appellate court may exercise jurisdiction to hear and reverse such holding where "the plaintiff's version of the facts, which the district court accepted,

was 'so utterly discredited by the record . . . that no reasonable jury could have believed him.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))

> Here, the issue raised on appeal—as presented by Officer Emmi—is:
>
> Did the district court improperly deny qualified immunity and summary judgment to Officer Emmi for a single deployment of his Taser where the mentally ill, physically imposing, and reportedly suicidal plaintiff *appeared to continue wrestling* with hospital personnel and others who were attempting to prevent him from leaving?

Appellant Br. 3 (emphasis added). This is a dispute about the facts as presented by Clay and accepted by the district court, not a question of law. Clay testified that (1) he did not resist at all, and (2) was already in handcuffs and lying face down on the ground when Officer Emmi tasered him. Emmi concedes neither of these material facts. As explained in Section II.C below, these facts do not fit into the exception discussed in *Scott* and *Romo*. Accordingly, if this factual dispute were the only issue before us, we would dismiss the case for lack of jurisdiction.

But in his argument that the level of force used was appropriate, Officer Emmi raised a second issue: he argues that the district court erred by determining that the Fourth Amendment rather than the Fourteenth Amendment governs the use of force in this case. This legal issue turns on facts that are not in dispute: the parties' actions at Clay's house, on the way to the hospital, and at the hospital before any force was used on Clay. The court must determine—based on these undisputed facts—whether the use of force against Clay constituted (1) a seizure governed by the Fourth Amendment, or (2) a use of force after the initial seizure had been completed and Clay was already in custody, which is governed by the Fourteenth Amendment.

"If . . . aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309-10 (6th Cir. 2005) (internal quotation marks and citations removed). Accordingly, we have jurisdiction over the appeal insofar as we must determine which amendment governs.

We review the denial of summary judgment on qualified immunity grounds de novo because the application of this doctrine is a question of law. *Morrison v. Bd. of Trustees of*

*Green Twp.*, 583 F.3d 394, 399 (6th Cir. 2009). In considering the record, the reviewing court "must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party," Clay in this case. *Griffith v. Coburn*, 473 F.3d 650, 655 (6th Cir. 2007). We begin with the legal issue, then turn to the factual dispute and discuss why it is not "blatantly and demonstrably false" within the limited exception acknowledged in *Scott*.

## B.  The Fourth Amendment applies

Officer Emmi argues that the district court mistakenly applied the Fourth Amendment's objective use of force standard to this case rather than the Fourteenth Amendment's subjective use of force standard. Following the parties' briefing on appeal, the Supreme Court rendered this issue purely academic in *Kingsley v. Hendrickson* by holding that a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment. 135 S. Ct. 2466 (2015). In light of *Kingsley*, under either amendment, the court would employ the same objective test for excessive force. *Id.* at 2472-73.

The district court's application of the Fourth Amendment rather than the Fourteenth Amendment, moreover, is warranted based on the facts in this record. The Fourth Amendment applies to the seizure of individuals due to mental health concerns, *Ziegler v. Aukerman*, 512 F.3d 777, 783-84 (6th Cir. 2008), and to excessive force claims alleged within the context of that seizure, *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). As with pretrial detainees, once a plaintiff finds himself in ongoing state custody after an initial mental health seizure, his excessive force claims generally[1] fall under the Fourteenth Amendment rather than the Fourth Amendment. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008). Here, there is no indication that Clay was seized before he refused to put on the dressing gown because he voluntarily rode to the hospital to "talk to somebody" and was not restrained.

Citing our decision in *Lanman*, 529 F.3d at 683, Officer Emmi argues that even though Clay went to the hospital voluntarily, the Fourteenth Amendment must apply because this court has applied it to both voluntary and involuntary committal cases. But the *Lanman* plaintiff was

---

[1]*Lanman* contemplates exceptions that are not applicable here. 529 F.3d at 681.

forcibly restrained after voluntarily committing himself by filling out the hospital's Adult Formal Voluntary Admission Application, which—as the opinion noted—enabled the hospital to keep him in custody for three days after he gave notice of his desire to leave. *Id.* at 677, 683. This three-day period was central to the court's holding. *Id.* at 683. Clay never signed such form, so the three-day holding provision was not in effect here.

Officer Emmi also argues that he took Clay into custody under a Michigan Mental Health Code provision that permits peace officers to place individuals who reasonably appear to require mental health treatment in protective custody and transfer them to a hospital for screening by a medical professional. *See* Mich. Comp. Laws § 330.1427. But the record does not show that Officer Emmi had actually taken Clay into custody before the incident at the hospital, given that the statute requires a peace officer who exercises this authority to inform the person being seized that he is being held in protective custody and is not under arrest. Mich. Comp. Laws § 330.1427a. Nothing in the record suggests that Emmi made any such statement to Clay. Clay simply agreed to accompany the paramedics to the hospital. Officer Emmi's police report indicates that he eventually filled out the application for an involuntary commitment of Clay, but it appears this was done after Emmi deployed the Taser on Clay.

Here, the facts support the district court's conclusion that the seizure occurred in the hospital after Clay refused to change clothes, and it is therefore the Fourth Amendment that applies.

## C.  Officer Emmi's failure to concede genuine issues of material fact

Under the Fourth Amendment—and since *Kingsley,* also the Fourteenth Amendment— the test for whether officers' use of force violated the Constitution is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Among the factors to be considered are whether the person being seized "poses an immediate threat to the safety of officers or others" and "whether he is actively resisting." *Id.* at 396.

Clay's level of resistance and whether he was handcuffed before being tasered—the facts Officer Emmi refuses to concede—are central to this inquiry. Emmi acknowledges that Clay "suggests" he stopped resisting before being tasered, but argues that Clay's testimony should not be credited due to his mental illness and drug use, and the contrary testimony of others on the scene. In doing so, Officer Emmi misconstrues *Scott*. There, based on a police videotape depicting the events at issue, the Supreme Court reversed the district court's denial of summary judgment (due to a genuine dispute of material fact) because the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." 550 U.S. at 380. Here, however, Officer Emmi's arguments transgress the well-recognized standard of Rule 56, that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Decisions on the credibility of a witness or the proper weight to be given to evidence are reserved to the trier of fact.

The district court correctly determined that there was a genuine issue of material fact concerning the level of force the officers used and the level of resistance offered by Clay. Though Clay indicated that he has some memory problems, both Clay and other witnesses recall that Clay called Easter Seals, was on the floor of the van when Officer Emmi arrived, voluntarily rode to the hospital, refused to put on gown that was given to him, and was eventually physically restrained. Clay's steadfast recollection that he was handcuffed before being tasered is not "so utterly discredited by the record" as to be rendered a "visible fiction," *Scott*, 550 U.S. at 380-81, simply because other witnesses testified to the contrary. Rather, the existence of these differing accounts of material facts supports the district court's conclusion: Officer Emmi was not entitled to qualified immunity at the summary judgment stage because these factual disputes must be resolved by a jury. We lack jurisdiction to resolve them and refuse to usurp the place of the jury by weighing the witnesses' relative credibility here.

## III. CONCLUSION

We AFFIRM the district court's order denying qualified immunity to Officer Emmi and remand the case to the district court for further proceedings.