OPINION
RONALD LEE GILMAN, Circuit Judge.
This case arises out of a putative class action against Franklin County, Ohio, its sheriff Zachary Scott, and 14 of the sheriffs deputies for allegedly using excessive force against detainees in the county jail and for violating the privacy of detainees through strip searches. Settlements were reached with all the plaintiffs other than Michael Reed, leaving Reed as the only detainee whose claims are presently before us. Reed alleges that the deputies used excessive force against him, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, when they subdued him with a Taser while he was in custody. He also argues that the county failed to train the deputies on the proper use of Tasers, thereby creating a policy and practice of abuse.
*129 The defendants moved for - summary judgment, with the individual defendants claiming qualified immunity and all defendants denying any constitutional violation. After determining that “no rational fact finder could conclude that the defendant deputies acted with conscience-shocking malice or sadism towards Mr. Reed during either the Cell Incident or the Hospital Incident,” the district court granted the defendants’ motion. For the reasons set forth below, we AFFIRM the judgment of the district court.
I. BACKGROUND
A. Factual background
Reed’s claims arise out of two incidents that both occurred on January 29, 2009. In the first incident' (the Cell Incident), which took place inside Reed’s cell at the Franklin County Corrections Center II (FCCC II), the sheriffs deputies were unable to handcuff Reed due to his resistance and twice used a Taser to subdue him. The second incident (the Hospital Incident) occurred later that day at the Mount Carmel West Hospital Emergency Room. There, a deputy used a Taser on Reed after Reed lunged at the deputy.

1. The Cell Incident

The genesis of the events' leading to Reed’s detention began in the early 1990s when Reed was involved in a motorcycle accident. As a result of the accident, Reed suffers from seizures. In August 2008, Reed had a seizure while walking down the street in Columbus, Ohio. Emergency personnel arrived and tried to take Reed to the hospital, but Reed violently resisted. Reed was taken into custody and charged with assaulting a peace officer.
The Franklin County Common Pleas Court found Reed not guilty by reason of insanity in December 2008 and ordered him committed to the Twin Valley Behavioral Healthcare Forensic Unit. But because the Twin Valley facility did not have space for Reed, he was still at FCCC II in January 2009.
On January 29, 2009, Reed suffered a seizure in- his cell. Several sheriffs deputies entered the' cell and attempted to handcuff Reed in order to transport him to a nearby hospital for medical treatment. In-their efforts to handcuff Reed, the deputies used a Taser on him twice. The entire incident is captured on video. Neither party contests the video’s admissibility or its completeness in portraying the relevant events. Instead, the parties dispute whether the video shows that the deputies violated Reed’s constitutional rights by using excessive force.
The video shows Reed - -sitting on- the floor of his cell,. apparently disoriented, with his hands raised and a cut above his left eye. As the recording begins, the deputies tell Reed four times to “Put your hands behind you.” The deputies explain to Reed that they are “going to put some cuffs on you for your safety and ours.” Reed then lowers his hands slightly, and a deputy takes Reed’s left hand, moves it behind Reed’s back,- and places one of the handcuffs on that hand.
But as the deputy tries to take Reed’s right hand and attach it to the other handcuff, Reed pulls the hand back and holds it across his chest. Deputies then coax Reed to sit up, but Reed twists to his left, leans back, and begins groaning. While this is taking place,' the deputies tell Reed four more times to put his hands behind his back. Now lying on the floor on his back, Reed again grasps the cuff on his left hand with his right. Twice more the deputies tell Reed to put his hands behind his back. They also tell Reed that he is “going to get Tased” if he does not cooperate and, four times, that it will hurt’. The deputies then *130 tell him three more times to “let go of the cuff.” At the same time, a deputy again tries to pull Reed’s hands apart and finish handcuffing him.
During this time, the deputies were aware that Reed’s loose handcuff posed a threat to their physical safety. One stated that he considered the loose handcuff “a major danger.” Another said that the open handcuff presented a “sharp [and] jagged edge” and that people had been killed from open handcuffs used as a weapon. This deputy had been trained never to lose control of an inmate with a loose handcuff.
Unsuccessful in all their efforts, the deputies step back from Reed and a different deputy volunteers to “get his cuff.” Two deputies try to pry Reed’s hands apart, but are unable to do so. Reed then crawls towards the officers, at which point a deputy uses a Taser on Reed. Reed falls onto his back and begins groaning and shaking in pain. A deputy then instructs Reed, “Don’t fight anymore.”
Recovering from the shock, Reed reaches towards the deputies and says “OK, OK, OK.” Reed again raises his hands in the air. The deputies instruct Reed “put your hands behind your back” eight times. But Reed mumbles something unintelligible and then says “please.” Reed continues to hold his hands in front of him and says “please, please, please, please.” Three deputies again attempt to grab Reed’s hands and secure the right handcuff on him, but are unsuccessful.
A deputy then uses the Taser on Reed a second time. Reed is told that they need to handcuff him so that they can take him out of the cell for medical treatment. One asks him “Do you want to get shocked again? Say no. Say no.” Even after using a Taser twice, three deputies struggled to get the handcuff on Reed’s right hand. Approximately two minutes after entering the cell, the deputies were finally able to secure the handcuff.
Reed continued to thrash about, even with both hands handcuffed behind his back. After five deputies held Reed down and made three further commands to “stop resisting,” the deputies finally managed to subdue Reed’s thrashing on the cell floor. The deputies were then able to secure leg irons on Reed and walk him out of his cell.

2. The Hospital Incident

According to the deposition testimony of Deputy James Dishong, he and Deputy Matthew Carter drove Reed to Mount Carmel West Hospital after Reed was secured. Deputy Dishong’s account of what happened at the hospital is uncontested in the record; no other depositions or record evidence speak to the incident.
Dishong testified that he and Carter took Reed to the hospital and eventually into a small examination space bordered by a wall and curtains where Reed was seen by a nurse practitioner. In the examination space, Dishong removed Reed’s handcuffs and used them to attach Reed’s leg irons to the bed rail, giving Reed approximately a five-foot radius of movement. The examination itself took place without incident.
Dishong, Carter, and Reed were waiting for the paperwork to be completed when Carter stepped out to use the restroom. As soon as Carter was gone, Reed turned to his left and began muttering. Dishong asked Reed if everything was all right. Reed continued muttering and squatted on the bed. Dishong told Reed to “lay back down,” but Reed did not heed Dishong’s command. He instead asked Dishong: “Do you want a piece of me?”
Dishong again instructed Reed to “lay back” or he would “have to be forced to tase you.” At that point Reed lunged *131 toward Dishong with his hands raised. Dishong Tased him, the probes striking Reed’s right shoulder and left leg. Reed struck the wall and fell to the floor.
B. Procedural background
In September 2012, the defendants moved for summary judgment on .Reed’s individual claims. Reed timely responded, but did not file any affidavits or additional proof in support of his Brief in Opposition. The district court granted summary judgment for all the defendants. Canvassing the record, the court found no evidence that they had acted with the requisite intent — “maliciously and sadistically for the very purpose of causing harm” — to violate Reed’s Fourteenth Amendment rights. See Darrah v. City of Oak Park, 255 F.3d 301, 306 (6th Cir.2001) (setting forth the standard for liability under the Fourteenth Amendment).
Reed argues on appeal that the district court erred because it “relied on the Defendant’s [sic] narration of facts” and thus “failed to view the facts in the light most favorable to the non[-]moving party.” His brief offers an alternative narration of the facts, relying on the video and his Second Amended Complaint. He claims that the “officers could have handcuffed Mr. Reed without the use of a Taser. Their utilization of the Taser in this instance was a clear violation of department policy relating to the usage of Tasers.” The defendants respond that the district court cor-, rectly determined that Reed identified no genuine dispute of material fact, that Reed’s claims arise under the Fourteenth Amendment, and that the court correctly found that Reed suffered no constitutional violation.
II. LEGAL STANDARD
A. Operative pleading
Before we analyze the substance of Reed’s appeal, one procedural point warrants clarification. Reed’s brief filed in this court cites extensively to his Second. Amended Complaint. But Reed’s Third Amended Complaint superseded his Second Amended Complaint when the magistrate judge granted Reed’s Motion to Amend the Complaint. See 61B Am. Jur.2d Pleading § 789 (“An amended pleading that is complete in itself and does not refer to or adopt a former pleading as a part of it supersedes or supplants the former pleading.”). Accordingly, any reliance that Reed places on his Second Amended Complaint is unavailing and should instead shift to his Third Amended Complaint. This matters little, however, because the evidence in the record, not the pleadings, governs whether a party has raised a genuine dispute of material fact sufficient to survive a motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
B. Summary judgment
“We review the district court’s grant of summary judgment on qualified immunity grounds de novo.” Burgess v. Fischer, 735 F.3d 462, 471 (6th Cir.2013). Summary judgment is proper where “there is no genuine dispute as to any material fact and the movant is entitled to judgment as . a matter of law.” Fed. R.Civ.P. 56(a). No genuine dispute of material fact exists where the record “taken as a whole could not lead a rational trier of fact to find for- the non-moving party.” Matsushita Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d- 538 (1986). Ultimately the court evaluates “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.” Anderson v. Liberty *132 Lobby, Inc., 477 U.S. 242, 251-52,106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw all reasonable inferences in favor of the nonmoving party. Burgess, 735 F.3d at 471.
A party asserting that a fact is genuinely disputed may not rely on the pleadings to establish that fact. Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that
[a] party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.
That is, a party must “go beyond the pleadings.” Celotex, 477 U.S. at 324, 106 S.Ct. 2548. “A dispute is ‘genuine’ only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.” Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir.2009) (emphasis added).
In Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court addressed the role of video evidence at summary judgment. The Court held that “[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.” Id. at 380, 127 S.Ct. 1769.
In that case, the plaintiff Harris claimed that the defendant police officer, Scott, used excessive force when he bumped Harris’s speeding car with his police cruiser, ultimately rendering Harris a quadriplegic. Id. at 375, 127 S.Ct. 1769. Harris contended that when Scott rammed his car, Harris was in full control and that the roads ahead were clear, so that the jury could have found Scott’s use of force excessive. Id. at 375-76, 127 S.Ct. 1769. The Supreme Court disagreed, observing that “[f]ar from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.” Id. at 380, 127 S.Ct. 1769. Accordingly, the Court determined that Harris’s “version of events is so utterly discredited by the record that no reasonable jury could have believed him.” Id. It thus held that the lower courts “should have viewed the facts in the light depicted by the videotape.” Id. at 381, 127 S.Ct. 1769.
Scott’s holding is twofold. First, Scott stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue. Id. at 380-81, 127 S.Ct. 1769. Second, Scott reaffirmed the holdings of Matsushita and Anderson that, in disposing of a motion for summary judgment, a court need draw only reasonable inferences in favor of the nonmoving party; it need not construe the record “in such a manner that is wholly unsupportable — in the view of any reasonable jury — by the video recording.” Marvin v. City of Taylor, 509 F.3d 234, 239 (6th Cir.2007); see also Green v. Throckmorton, 681 F.3d 853, 859 (6th Cir.2012) (holding that the court should “view[ ] the facts in the light depicted by the videotape,” and that “[t]he central issue is whether the evidence ... is so one-sided that one party must prevail as a matter of law”) (internal quotation marks omitted). This court has also clarified that there is “nothing in the Scott analysis that suggests that it should be restricted to *133 cases involving videotapes.” Coble v. City of White House, 634 F.3d 865, 868-69 (6th Cir.2011).
III. RELEVANT CONSTITUTIONAL STANDARD
A. Substantive basis for Reed’s claims
Before analyzing the evidence in this case, we first address the substantive basis for Reed’s claims. Reed pleaded his claims under 42 U.S.C. § 1988. Section 1983 provides that
[ejvery person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
Reed claims that the deputies violated his rights under either the Eighth or Fourteenth Amendments to the United States Constitution.
Typically, the Fourteenth Amendment’s Due Process Clause protects pretrial detainees from excessive force that amounts to punishment, Leary v. Livingston Cnty., 528 F.3d 438, 443 (6th Cir.2008), and the Eighth Amendment protects convicted prisoners from “unnecessary and wanton infliction of pain,” Graham v. Connor, 490 U.S. 386, 398 n. 11, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). The district court determined that Reed’s situation — awaiting transfer to a mental-health facility after being found not guilty by reason of insanity — “d[id] not fit squarely into any of these categories.” But citing this court’s decision in Lanman v. Hinson, 529 F.3d 673, 680-81 (6th Cir.2008), the district court held that the Fourteenth Amendment applied to Reed.
Lanman clarified that
[i]f the plaintiff was a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard sets the standard for an excessive force claim. But if the plaintiff was a free person, and the use of force occurred in the course of an arrest or other seizure, then the plaintiffs claim arises under the Fourth Amendment and its reasonableness standard.
Id. at 680 (citations omitted). Of particular significance for the present case is Lanman’s insight that “[t]he Fourteenth Amendment is the source of a pretrial detainee’s excessive force claim because when a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials.” Id. at 680-81. But “[njotwithstanding the Due Process Clause’s broader applicability, we remain cognizant of the fact that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.” Burgess v. Fischer, 735 F.3d 462, 473 (6th Cir.2013) (internal quotation marks omitted).
The difference is this: An excessive-force claim under the Eighth Amendment requires that the plaintiff show that force was not “applied in a good-faith effort to maintain or restore discipline,” but instead applied “maliciously and sadistically to cause harm.” See Pelfrey v. Chambers, 43 F.3d 1034, 1037 (6th Cir.1995). But an excessive-force claim under the *134 Fourteenth Amendment operates on a sliding scale. Generally, -to constitute a Fourteenth Amendment violation, an official’s conduct must “shock[] the conscience.” Burgess, 735 F.3d at 473.
When officials respond to “a rapidly evolving, fluid, and dangerous predicament,” id. (internal quotation marks omitted), the Fourteenth Amendment’s excessive-force standard is the same as the Eighth Amendment’s: “[T]he plaintiff must show that the defendant acted maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline.” Id. (internal quotation, marks omitted). But “[w]here defendants are afforded a reasonable opportunity to deliberate ... [,] their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiffs federally protected rights.” Id. (alteration in original) (internal quotation marks omitted).
This state of culpability is clearly set out in Darrah v. City of Oak Park, 255 F.3d 301 (6th Cir.2001): Id. at 306 (alteration in original) (internal quotation marks omitted); see also 'Burgess, 735 F.3d at 473 (same). We will therefore evaluate this case according to the Darrah standard. Accord Youngberg v. Romeo, 457 U.S. 307, 314, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (considering “the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution”); Terrance v. Northville Reg’l Psychiatric Hosp., 286 F.3d 834, 848 (6th Cir.2002) (holding that “[t]he involuntarily committed have greater rights regarding confinement under the Fourteenth Amendment than criminals are due under the Eighth Amendment”).
[I]n situations where the implicated government actors are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action ..., their actions will be deemed conscience-shocking if they were taken vdth. deliberate indifference towards the plaintiffs federally protected rights. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation ..., public servants’ reflexive actions shock the conscience only if they involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline.
B. Qualified immunity
Also at play in this case is the doctrine of qualified immunity. “The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Stanton v. Sims, — U.S. -, 134 S.Ct. 3, 4, 187 L.Ed.2d 341 (2013) (internal quotation marks omitted). “Once raised, it is the plaintiffs burden to show that the defendants are not entitled to qualified immunity.” Burgess, 735 F.3d at 472. In the Sixth Circuit we have generally “use[d] a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident.” Id. Because we resolve the present case by affirming the determination that no constitutional violation- occurred, we need not address whether the alleged right was clearly established. See id. (“We can consider these steps in any order.”).
*135 IV. CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS
A. The Cell Incident
The video recording in this case provides sufficient evidence for a jury to find that the situation in the cell afforded the deputies “a reasonable opportunity to deliberate various alternatives prior to electing a course of action.” Darrah, 255 F.3d at 306 (internal quotation marks omitted). Reed was warned multiple times that he was “going to get Tased” if he did not cooperate and that it would hurt. The deputies also tried to wrestle him to the ground to cuff him several times before the first use of the Taser. After each attempt, they backed away. And, at one point, a deputy volunteered to “get his cuff’ and other deputies assisted him. These are the kinds of statements that would permit a jury to infer that the deputies had an opportunity to deliberate before taking the actions that they did. See McKenna v. Edgell, 617 F.3d 432, 441 (6th Cir.2010) (“[W]e ask the jury to determine whether a set of facts amounted to exigent circumstances.”) (emphasis in original).
But these same facts also compel the conclusion that the deputies did not act with “deliberate indifference towards [Reed’s] federally protected rights.” Darrah, 255 F.3d at 306 (internal quotation marks omitted). That they tried to handcuff him several times before using the Taser shows that they sought to minimize the Taser’s use. The deputies also warned Reed that the Taser would hurt and that he did not want to be Tased, which showed that they were trying to avoid unnecessary harm.
Another crucial factor is the uneontra-dicted testimony indicating that the deputies faced an ongoing danger with Reed thrashing about on the cell floor with a loose handcuff. The deputies had been trained never to lose control of an inmate with a loose handcuff because they knew that it could be used as a weapon. Under these circumstances, even if Reed was suffering from a seizure and unable to comprehend the deputies’ statements, Reed could not establish an excessive-force claim under the Fourteenth Amendment when the deputies used a Taser to subdue him and secure the handcuffs.
Nothing in the record indicates that the deputies acted for any reason other than getting medical treatment for Reed following his seizure, a serious medical need to which indifference would likely have been a constitutional violation in itself. Reed in fact does not challenge the reasonableness of the deputies’ decision to handcuff him— for their protection and his — prior to transporting him to the hospital. His challenge is instead limited to the use of the Taser. But we find no basis to hold that the deputies’ use of a Taser after several failed attempts to wrestle the handcuffs onto Reed was “conscience shocking.”
The dissent responds with the point that Reed’s failure to comply was due to him acting “reflexively” (Dissent at pp. 145-46), implying that Reed’s actions might not have been intentional. Reed’s intent is irrelevant, however, because the constitutional inquiry centers on the deputies’ intent, not Reed’s. See Ewolski v. City of Brunswick, 287 F.3d 492, 510 (6th Cir.2002) (holding that the plaintiff “must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment”) (internal quotation marks omitted) (emphasis added): A jury would therefore not be entitled to find that the Tasing was done with deliberate indifference toward Reed’s federally protected rights. Summary judgment was thus proper on Reed’s claims related to the Cell Incident.
*136 Reed attempts to circumvent this conclusion through bare assertion. In his response to the defendants’ motion for summary judgment, Reed said only that “[i]t is clear from the videos and the facts and circumstances of the case that [the deputies] had an express intent to punish Mr. Reed.” This statement appears without any citation to the record, as does the entire recounting of events in Reed’s Response. But Rule 56(c) of the Federal Rules of Civil Procedure requires a party to “go beyond the pleadings” and identify admissible evidence of the essential elements of his claim. See Celotex Corp. v. Catrett, 477 Ü.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Reed’s complaint does not satisfy this standard for the simple reason that pleadings are not evidence. Compare Fed.R.Civ.P. 8 (defining pleadings) with Fed.R.Evid. 401 (defining relevant evidence).
The dissent responds that “[i]n light of all of the evidence, including the video, a reasonable jury could undoubtedly find that the officers’ use of force shocks the conscience because it was taken with deliberate indifference toward Reed’s federally protected rights.” (Dissent at p. 145) But Reed did not cite any materials supporting an inference that' deputies acted with' deliberate indifference, and the district court “need consider only the cited materials.” Fed.R.Civ.P. 56(c)(3). The dissent cannot now attempt to salvage Reed’s claims by providing record citations that Reed himself failed to present to the district court.
All of this leaves Reed with nothing more than the argument that we should infer deliberate indifference from the video recording. But we have seen the recording. It shows that three deputies tried three times to handcuff Reed before the first use of a Taser, and they were again unsuccessful before deploying the Taser a second time; it shows that they instructed him at least a dozen times to put his hands behind his back so that they could put handcuffs on him; it shows Reed flailing around with" a loose handcuff; and finally, it shows that they warned him four times that the Taser would hurt. The deputies’ use of the Taser in this context may have been a miscalculation, but it does not “shock the conscience.” See Darrah, 255 F.3d at 306.
In reaching the opposite conclusion, the dissent relies on an unpublished opinion from this court, Eldridge v. City of Warren, 533 Fed.Appx. 529, 533 (6th Cir.2013), to draw an illusory distinction between active resistance and mere noncompliance. The dissent contends that the video recording depicts the latter and that only active resistance can possibly justify the use of a Taser. This theory has numerous pitfalls. First, Eldridge is an unpublished opinion that “fails to provide any prece-dential guidance.” See United States v. Johnson, 467 F.3d 559, 566 (6th Cir.2006). This court has therefore not “recognized an important distinction between noncompliance and ‘active resistance’ ” as claimed by our dissenting colleague. (Dissent at pp. 145-46)
Second, even if Eldridge were good law, it is easily distinguishable from Reed’s case. Eldridge concerned a suspected drunk driver who had driven his car into a “condominium complex, over a curb, and through patches of grass” before “eventually [coming] to a halt at a construction area, with further progress stifled by temporary construction barricades.” 533 Fed. Appx. at 530. Officers approached the driver and repeatedly ordered him out of his car. When the driver refused to comply,. They removed the car keys and “tuggfed]” on his arm in an attempt to remove his hands from the steering wheel. Id. at 530-31. The driver continued re *137 sponding simply “I’m fíne” to the officer’s commands until one of the officers used a Taser. Id. at 531. Under these circumstances, this court determined that the issue of excessive force was a question for the jury. Id. at 533.
The deputies here, in contrast, used the Taser only after multiple warnings and multiple attempts to -wrestle Reed’s arms behind his back. Moreover, the deputies testified that the loose handcuff on Reed’s left hand could have been used as a weapon. Tasing a struggling detainee with a loose metal handcuff is simply not akin to Tasing a suspected drunk driver who was doing nothing more than declining to take his hands off the steering wheel.
One further point distinguishes Eldridge: Eldridge concerned the suspect’s Fourth Amendment rights because the driver had not yet been arrested. See id. at 532. Under the Fourth Amendment, a court must determine whether the officers’ conduct was “objectively reasonable.” See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Reed, however, had already been arrested and was in custody at the county jail. As such, Reed’s claim arises under the Fourteenth Amendment, a standard that is more difficult for a plaintiff to meet. See Darrah, 255 F.3d at 306 (noting that excessive force under the Fourteenth Amendment is a “substantially higher hurdle” for the plaintiff to meet than the “objective reasonableness test of Graham, in which excessive force can be found if the officer’s actions, in light of the totality of the circumstances, were not objectively reasonable”) (internal quotation marks omitted).
Moreover, this case is not a reprise of Harris v. City of Circleville, 583 F.3d 356 (6th Cir.2009). In Harris, police officers had placed Harris in handcuffs with his hands behind his back.. Id. at 360. While one officer told Harris to kneel down, another held Harris’s hands up, making it impossible for Harris to comply with the command to kneel. Id. at 361. The officers then forcibly subdued Harris and deployed a Taser. Critically, the court recognized that “Harris was not doing anything to resist.” Id. The deputies here, in contrast, used the Taser only after multiple warnings and, more importantly, multiple attempts to wrestle Reed’s arms behind his back.
We also do not believe that the deputies were constitutionally required to exhaust all possible alternatives before using a Ta-ser. Our dissenting colleague proposes that the deputies could have finished handcuffing Reed in front of his body or waited until Reed had recovered from the lingering effects of the seizure. The first proposed alternative raises an impossible hypothetical — one which finds no support in the record, is not advocated by Reed himself, and cannot be determined from the video recording. Indeed the recording shows that Reed began thrashing each time the deputies attempted to secure him, not that he was averse only to placing his hands behind his back.
And requiring the deputies to wait until Reed had fully recovered from the seizure’s lingering effects would have placed the deputies in an impossible Catch-22 situation: wait too long and risk being accused of the “unnecessary and wanton infliction of pain” by their deliberate indifference to Reed’s serious medical needs, see Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotation marks omitted), or act too quickly and risk being charged with “deliberate indifference towards the plaintiffs federally protected rights,” see Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir.2000) (internal quotation marks omitted). We decline to put the onus on the deputies to *138 assess at their risk the seriousness of Reed’s seizure in order to determine whether it warranted immediate medical treatment. Their decision to use a Taser to subdue Reed before taking him to the hospital might have been unwise, but it was not unconstitutional.
B. The Hospital Incident
Likewise, we agree with the district court’s determination that Deputy Dishong did not violate Reed’s constitutional rights during the Hospital Incident. Dishong testified that- as soon as Carter was gone, Reed turned to his left and began muttering and squatted on the bed. He told Reed to “lay back down,” but Reed did not heed the command. Instead, Reed asked Dishong “Do you want a piece of me?” and lunged toward Dishong with his hands raised. Dishong explained that he had “no way of retreating” because of the cramped quarters and Reed’s position over him while standing on the bed. With these considerations in mind, Dishong Tased him.
This testimony does not support the conclusion that Dishong was “afforded a reasonable opportunity to deliberate,” 'and Reed offers no evidence of his own. See Darrah, 255 F.3d at 306 (internal quotation marks omitted). On the record before us, there can be no dispute that the Hospital Incident was “a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation.....” Id. (internal quotation marks omitted).
In this context, Reed must show that Dishong’s actions “involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline.” Id. (internal quotation marks omitted). He directs us to no such proof. Absent any evidence in the record that Dishong acted with malicious or sadistic intent, a jury would not be entitled to so find. ■
The dissent responds by arguing that Dishong may have violated the county’s use-of-force policy prohibiting the use of Tasers on inmates who are restrained by leg irons. But the dissent cites no authority for the proposition that any violation of a county’s use-of-force policy equates to a constitutional violation. The relevant question, in other words, is not whether Dishong used his Taser on an inmate restrained by leg irons, but whether he did so “maliciously and sadistically for the very purpose of causing harm.” Id. (internal quotation marks omitted). On this question, the evidence is beyond dispute that he did not. Summary judgment in favor of Dishong was therefore appropriate.
V. CLAIMS AGAINST FRANKLIN COUNTY
We now turn to Reed’s claims against Franklin County, which rely on Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018/56 L.Ed.2d 611 (1978). Monell held that “[l]oeal governing bodies ... can be sued directly under § 1983 ... where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers.” Id. at 690, 98 S.Ct. 2018. But “Pliability against [a local government] arises only if it violated a constitutional or statutory'right through a custom or practice of doing so.” Hidden Vill, LLC v. City of Lakewood, 734 F.3d 519, 523 (6th Cir.2013). Because we conclude that Reed suffered no violation of his constitutional rights, Reed’s claims against Franklin County fail. His Monell claims are therefore without merit.
*139 VI. CONCLUSION
For all of the reasons set forth above, we AFFIRM the judgment of the district court.